# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

MEGAN WAITE,          )
                        )
     Plaintiff,      )
                        )        Case Number:
v.                  )        2:16-cv-01244-JEO
                        )
THE BOARD OF TRUSTEES OF  )
THE UNIVERSITY OF ALABAMA,  )
                        )
     Defendant.     )

## MEMORANDUM OPINION

In this action, Plaintiff Megan Waite, a former graduate student at the

University of Alabama at Birmingham ("UAB"), claims that its Board of Trustees

(the "Board") is liable for pregnancy discrimination and retaliation in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.,

as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k).

(Doc.[1] 1).  The cause now comes to be heard on the Board's motion for summary

---

[1] References to "Doc(s) ___" are to the document number(s) of the pleadings, motions, and other
materials in the court file, as compiled and designated on the docket sheet by the clerk.  Pinpoint
citations to deposition testimony are to the page of the reporter's transcript, which such citations
to affidavits and declarations are to the paragraph of the document.  Unless otherwise noted,
other pinpoint citations are to the page of the electronically-filed document in the court's
CM/ECF filing system, which may not correspond to pagination on the original "hard copy"
presented for filing.

judgment.  (Doc. 27).  For the reasons explained below, the court[2] concludes that the motion is due to be granted.

## I.     SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a defendant is authorized to move for summary judgment on the claims asserted against it.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not

---

[2]The action is assigned to the undersigned pursuant to 28 U.S.C. § 636 and the court's general order of reference dated January 2, 2015.  The parties have consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed. R. Civ. P. (Doc. 13).

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. Proc. 56(c)(1)(A), (B).  In its review of the record, a court must credit the evidence of the non-movant and draw all justifiable inferences in that party's favor.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.    BACKGROUND[3]

In March 2013, Plaintiff was admitted as a graduate student in UAB's Behavioral Neuroscience ("BN") Program in the Department of Psychology. Plaintiff enrolled that summer, and she remained an active participant the program for all of one academic year, 2013-2014, and most of the next, 2014-2015. Plaintiff's last day actually in classes and performing lab work was in early June 2015, whereupon she went on maternity leave.  Ultimately, in August 2016, she notified the BN Program Director, Dr. Frank Amthor, that she no longer would be participating in the program and thus desired to terminate her student status.

---

[3] The summary in this background section is taken from the court's review of the well-pled factual allegations of the complaint where uncontested and from the evidentiary materials in the court file.  While the parties dispute certain facts, the evidence is presented here, consistent with the standard of review at summary judgment, in the light most favorable to Plaintiff as the non-movant, with reasonable inferences drawn in her favor.  Accordingly, these are the facts for purposes of the instant motion only; they may not be the actual facts.

In her two years in the program, Plaintiff was awarded a "tuition scholarship," which covered not only the cost of courses but also "mandatory fees, including medical/hospital insurance and insurance administration fees." (Doc. 29 at 10, 13). In both years Plaintiff was also appointed as a "Graduate Trainee." As such, UAB paid her a "stipend" of $1,972.50 per month, translating to $23,670.00 annually, which, according to her appointment letters, was "intended to help [her] be a full-time student, immersed in [her] graduate program." (Doc. 29-2 at 8, 11). Indeed, as a condition of receiving her stipend, Plaintiff was prohibited from engaging in any other paid work on or off campus without written consent of the dean of the graduate school. (*Id.*)

The letter offering Plaintiff her stipend for the 2013-14 academic year labeled that appointment a "Graduate Trainee Fellowship," for which "[n]o services are required as a condition." (*Id*. at 8). Rather, it mandated only that Plaintiff "register for, and satisfactorily complete" a specified number of course credit hours and "remain in good standing and make satisfactory progress toward [her] degree." (*Id*.) That letter further explained that, in each subsequent year, her stipend might be in the form of either another "Graduate Fellowship" or a "Graduate Assistantship." (*Id*.) If it were the latter, the letter said, Plaintiff would "be given a service assignment of no more than 20 hours per week by [her] mentor, Graduate Program Director, or Departmental Chair," designed "to enhance [her]

professional development, as well as contribute to the teaching, research, or service missions of the university." (*Id*.) To that end, while Plaintiff's appointment letter for her second academic year, 2014-15, did not use the term "Assistantship," it expressly stated that she would be given just such a weekly "assignment." (Doc. 29-2 at 11). That letter also no longer referred to her appointment as a "fellowship" and no longer provided that "no services were required." Finally, Plaintiff's 2014-15 appointment letter again recognized that she had to "remain in good standing and make satisfactory progress toward [her] degree," specifically requiring her to "register for, and satisfactorily complete, at least 23 semester hours of approved graduate course work each year (at least 9 hours in the Fall and Spring and 5 hours in the summer)." (*Id.* at 11; *see also id.* at 69, 71).

Despite the characterization in Plaintiff's appointment letter that her first-year stipend was a "fellowship" for which "no services" were "required," Plaintiff nonetheless regularly worked in UAB labs during both of her years in the program. First year students in the BN program went through three lab rotations, one per academic term, at the conclusion of which they would select a professor they wanted to serve as their program "mentor." (Doc. 29-13; *see also* Doc. 29-3, Deposition of Robert Sorge ("Sorge Dep.") at 63). Per UAB policy, graduate students also received one semester hour of course credit toward their degree for every 30 hours of such lab work. (Doc. 29-2 at 68). In Plaintiff's case, she started

her first year working in the lab of Dr. Robert Sorge, a professor in UAB's

Department of Psychology, from the summer of 2013 to December of that year.

(Doc. 29-2 at 51). For the spring term, from January to April 2014, she worked in

a different psychology professor's lab before rotating back to Dr. Sorge's lab in

May 2014. (*Id.*) Plaintiff ultimately chose Dr. Sorge as her program mentor, and

his was the only lab in which she worked thereafter while in the program. (*Id.*)

In December 2014, Plaintiff told Dr. Sorge that she was pregnant. Soon

after, they had a discussion about maternity leave. Under the policy of the UAB

graduate school, graduate trainees and graduate assistants are entitled to 30 work

days of paid parental leave. (Doc. 29-8 at 13). Dr. Sorge told Plaintiff that she

could take that time either as six weeks of full-time absence or as a combination of

fewer weeks of full-time leave followed by a period of half-time leave. (Sorge

Dep. at 18). Plaintiff recounts that she and Dr. Sorge "discussed her taking six

weeks of full-time absence" and that, "at the beginning of the discussions, [she]

left it open to [taking] two to four weeks of part-time return," and she "ultimately

decide[d] on" leave that would include two weeks of part-time hours. (Doc. 29-1,

Plaintiff's Deposition ("Pl. Dep.") at 25).

On January 3, 2015, Plaintiff sent an email to Tammie Quinn, the supervisor

of Dr. Sorge's lab, setting out a schedule of pre- and post-natal doctor's

appointments she expected to attend, as well as the due date for her baby: July 30,

2015.  (Doc. 29-6 at 6-7).  On June 5, 2015, however, Plaintiff sent an email to Terri Roberson, the Graduate Programs Manager for the Psychology Department, notifying her that, due to complications with Plaintiff's pregnancy, her doctor had placed her on bed rest, requiring an immediate leave of absence.  (Doc. 29-2 at 18; *see also* Doc. 29-6 at 13).  Plaintiff further inquired about her leave, including how it would be split between paid and unpaid, maternity and medical otherwise, and what she needed to do.  (Doc. 29-2 at 18).  Roberson responded with an email explaining that, as it related to Plaintiff's "Graduate Trainee/ Fellowship" appointment, she would immediately go on "paid parental leave" for 30 work days, covering a six-week period from June 8 to July 17, 2015.  (Doc. 29-2 at 96-97).  Once that expired, Roberson said, Plaintiff would need to request a "Leave of Academic Absence" through the graduate school, as outlined in the UAB Graduate Student Handbook.  (*Id.*; *see also id.* at 69).  Roberson observed that Plaintiff would not be paid during that leave of academic absence.  (Doc. 29-2 at 96-97).  However, it appears that UAB continued to pay Plaintiff's stipend through July 31, 2015, albeit inadvertently, thereby giving her two weeks of paid maternity leave beyond that to which she was entitled under UAB's policy.   (Pl. Dep. at 87; Roberson Dep. at 40-41, 91; Doc. 29-6 at 21).  Finally, Roberson stated that, as it related to Plaintiff's "enrollment as a student," she would also need to complete an attached form requesting a "medical withdrawal" from her summer 2015

coursework.  (Id.)  Thereafter, Plaintiff's submitted such a request (Doc. 29-2 at 99) that was then approved.  (Id. at 101).  As a result, she was dropped from her only summer course: research work in Dr. Sorge's lab for five credit hours.  (*Id.* at 102).

On July 27, 2015, Plaintiff delivered her baby.  On August 6th, with fall term classes slated to begin on August 24th, Roberson emailed Plaintiff asking about her plans and noting "the need to get [her] processed for the next academic year."  (Doc. 29-2 at 16).  On August 17th, Plaintiff responded, stating that she was "thinking of taking 4 more weeks" of full-time leave, until mid-September, and then "doing a few weeks [of] half days before coming back full time … around Oct[ober]."  (Id. at 14).  Roberson replied the same day, telling Plaintiff that since she would not be returning at the beginning of the fall term, it was "not as urgent" to get her scholarship and appointment offer letters for the upcoming 2015-16 academic year prepared and signed.  (*Id.*)

The next morning, August 18, 2015, Roberson forwarded to Dr. Sorge and Quinn the email Plaintiff had sent the day before.  (Doc. 29-6 at 32).  Dr. Sorge replied to Roberson stating, "That sounds good for [Plaintiff] to be back in October, but my concern is that she will not be in the lab for those research credit hours for this term.  It hardly seems fair to the other students in the program who are present to earn those hours."  (*Id.* at 31).  Meanwhile, after receiving Plaintiff's

forwarded email from Roberson, Quinn sent a text message that same morning to Plaintiff asking her whether she was "planning to take seminar and research hours," adding that she, Quinn, was "not sure how that will work with part-time hours." (Doc. 29-6 at 22). Plaintiff texted back that she too was "not really sure how any of that stuff would work" but that she recalled Dr. Sorge saying "at the beginning" that he "wouldn't mind if [she] came back part time for a little bit before coming back full time." (*Id*. at 22-23). Plaintiff added that she had to be on campus for an appointment the next day and another the next week and that she "figured [she] would stop in to talk about" her return. (*Id*.) Quinn texted back that, indeed, "no one seems to know" how the leave and return issues were supposed to be handled. (*Id*. at 24). Quinn acknowledged, however, that "part-time to full-time [was] still ok," though she also noted that "a problem comes with the registration for full-time and the number of credit hours." (*Id*. at 24).

Later that same afternoon of August 18th, Quinn sent an email to Dr. Sorge asking for his approval of a draft of an email that she planned to send to Plaintiff. (Doc. 29-6 at 30-31). In that proposed email, Quinn would offer Plaintiff two options for her return from leave. In one, Plaintiff would simply take a leave of absence for the entire the fall term and return full time at the start of the spring term in January 2016. In the other, Plaintiff would register full-time for fall classes, return part-time in September 2015 and then full-time in October. (*Id*.)

Quinn further proposed telling Plaintiff, however, that the latter scenario entailed an issue related to the number of lab hours she would have to complete to qualify for her required course credit hours.  (*Id*.)  Dr. Sorge responded that Quinn's proposed email "sounds fine," though he suggested that she might also "want to lay out the fact that 8 credit hours is 240 lab hours plus the assistantship."  (*Id*. at 30).  Quinn replied, "That part will be up to you when she comes in to speak with you.  I believe she will come in this week."  (*Id*.)  Following the exchange, Quinn sent an email to Plaintiff on August 18, 2015, stating as follows:

> After speaking with both [Roberson] and the grad office there are two possible scenarios.  #1.  You could take a leave of absence for the fall semester and then return full force in January.  #2.  You would have to register full-time for fall classes, return part-time in September and full time in October.  Your letter of offer would reflect an Oct[ober] date, accommodating your part-time start and the fact you were paid extra weeks in July.  (The main consideration in this scenario is the amount [of] lab hours you have to complete in order to qualify for your credits).  Hope this is helpful.  Talk to [Dr. Sorge] about it so that you guys can decide on the best course of action.

(Doc. 29-2 at 75).

Although Plaintiff had indicated in her text to Quinn that she would be coming by the lab in the next week to talk to Dr. Sorge about her return, and Quinn's had also instructed Plaintiff to do so, Plaintiff did not.  On August 25, 2015, with fall classes having started the day before, and no one having heard from Plaintiff in a week, Roberson sent Plaintiff a follow-up email, copied to Dr. Sorge and Quinn, stating as follows:

I know you are busy, and I don't mean to rush you.  Please know that
you must decide this week on which option below in [Quinn's] email
[of August 18th] will work best for you.  Your tuition has not been
paid, and we will need to get your return date to place in your offer
and tuition scholarship letters.  The last day to withdraw without
paying full tuition and fees is Monday, August 31st, so we need to
move forward on a resolution by Friday[, August 28th].

Be in touch as soon as you can.

(Doc. 29-2 at 74).  The next day, Wednesday, August 26th, Dr. Sorge sent an email

to Quinn acknowledging Roberson's above email to Plaintiff and asking Quinn to

text Plaintiff to make sure that she responded to Roberson's email "ASAP."  (Doc.

29-6 at 34).  "Otherwise," Dr. Sorge wrote, "we will withdraw her from the

program for Fall."  (*Id*.)  Quinn replied that she had already sent Plaintiff "multiple

emails" but that she would text her as well.  (*Id*. at 33).  Dr. Sorge replied: "Text

her again and let her know that she needs to address this ASAP.  She hasn't

contacted me yet at all and I'm starting to feel as if withdrawing is the best option,

at this point."  (*Id*.)

On Friday, August 28th, at 1:05 p.m., Dr. Sorge sent an email to Roberson

stating, "I have still heard nothing from [Plaintiff] and I don't believe [Quinn] has

either.  Assuming that she hasn't contacted you, I would suggest withdrawing her

from the program for this term."  (Doc. 29-6 at 35).  Roberson, in turn, sent an

email to the UAB registrar's office at 1:57 p.m. asking that Plaintiff be withdrawn

from the two classes for which she had registered for the fall term, a one semester-hour seminar and eight semester-hours of work in Dr. Sorge's lab. (*Id.* at 36).

Unaware that she had been withdrawn, Plaintiff sent an email to Roberson, Dr. Sorge, and Quinn at 3:44 p.m., responding to Roberson's email of August 25th, advising Plaintiff that she had to decide on one of the two options set forth in Quinn's email of August 18th. (Doc. 29-2 at 74). In her response email, Plaintiff stated: "Option 2 would be good for me if that's okay," meaning she preferred to register full-time for fall classes, return part-time in September and then full time in October. (*Id.* at 74; *see also id.* at 75). Apologizing for her "late response," Plaintiff further explained that she had "already set her childcare start at that point" and that she "couldn't get ahold of anyone to get clarification on the hours thing, but if that seems prohibitive for whatever reason what would the cost be for late withdrawal?" (*Id.*) At 3:57 p.m., Roberson sent with an email back to Plaintiff, copied to Sorge and Quinn, stating:

> I have already withdrawn you from classes for this semester, as a result of not hearing back from you. I tried to reach by telephone before having your classes administratively dropped this afternoon. UAB doesn't have provisions for late withdrawals. If you were to withdraw after August 31st, full tuition and fees would still be required. If you can work out the time schedule with [Dr. Sorge] and [Quinn], you have until the 31st to add the courses back to your schedule. However, if you are doubtful that you can work the number of hours required for course credit, you may want to consider not adding them back to your schedule.

> The other issue is insurance.  I seriously hated to withdraw you [from] classes because I did not know if you needed insurance.  Let me know how you would like to move forward, as time is a serious factor at this point.

(*Id*. at 73-74).  At 4:05 p.m., Dr. Sorge weighed in as well with an email to Plaintiff stating:

> To echo what [Roberson] said, we have heard nothing for quite a while and that is troubling.  Added to that, [Dr. Amthor], as Director [of the BN program], was not included on these messages and we are unsure that you can even have 8 credit hours of research.  Any decision like that should have been ok'd by myself and [Dr. Amthor] before they [sic] were made.  I not sure what the best option is, but we want the best for you and your family.  With respect to your email, the graduate school handbook says that 1 credit hour of research time is equivalent to 30 hours of in-lab time.  Therefore, 8 credit hours would be 240 hours of in-lab time.  Coupled with your research assistantship that requires 20 hours a week, this would require you to put in just under 10 hours a day from October 1 until December 11.  Personally, I don't think that is an attainable goal for most people.

(Doc. 29-2 at 77).  At 5:10 p.m., Plaintiff replied to Dr. Sorge's email, saying, "What you've said is definitely understandable.  It seems like at this point, it is more feasible to return full time in January.  That's what I was getting out of what you said.  Do you agree?"  (*Id*.)  Dr. Sorge wrote back:  "I think that is likely the best option for all, assuming we can avoid any gaps in insurance for yourself and [your baby].  Of course this, in no way, means we don't want to see you around here before then."  (*Id*. at 76).  Plaintiff answered, "We should be okay since we'll be on [my husband's] insurance.  I'm sure we'll see you soon."  (*Id*.)

Meanwhile, Plaintiff also sent another email to Roberson, asking when her existing student health insurance coverage through UAB would end. (Doc. 29-6 at 37). Roberson wrote back that Plaintiff should "immediately look into getting onto [her] husband's insurance," because Roberson "believe[d Plaintiff's] coverage may have ended on August 14th," given that she was "not returning for this academic year, as of yet." (*Id*.) Roberson's email also told Plaintiff not once but twice to "double check with VIVA [Health]," UAB's student insurance carrier, to be sure when her coverage would lapse. (*Id*.)

Plaintiff thereafter submitted a request to be placed on an academic leave of absence for the entirety of the fall term, retroactive from August 24, 2015, through January 11, 2016. (Doc. 29-2 at 92-94; Doc. 29-6 at 43-44). That request was approved. On October 28, 2015, Quinn emailed Plaintiff, stating as follows:

> Hope you are doing well! I just want to give you a heads up about registration. You need to get it done soon so that you can go over it with [Dr. Sorge]. We are expecting you back in the lab full time Jan. 11th, 2016. [Roberson] is already creating you[r] offer letter and we need to get signed and sealed before Christmas in order to avoid any pay delays.

(Doc. 24-2 at 95). Plaintiff, however, did not respond to that email.

Instead, the next day, October 29, 2015, she filed an administrative charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 29-2 at 26). Plaintiff claimed therein that UAB discriminated against her

because of her "sex, pregnancy," in violation of Title VII,[4] based on allegations

that, after she took maternity and medical leave from June through August 2015,

she had not been allowed to return to work on a part-time basis in September, in

advance of a full-time return thereafter. (*Id*.) Instead, she asserted, when she asked

to return part time, she was told she had been withdrawn from classes, "which

resulted in [her] being discharged." (*Id*.) In the end, Plaintiff never again registered

for classes, worked in Dr. Sorge's lab, or otherwise returned as an active student in

the BN program. Indeed, it does not appear that Plaintiff further communicated

with anyone in the program until she sent an email to the director, Dr. Amthor, on

August 9, 2016, giving notice that she would no longer be participating in the

program and asking to terminate her student status. (Doc. 29-2 at 103).

Before sending that final email, however, Plaintiff received a letter from

UAB in May 2016 stating that she owed $840.00 on her student account. (Doc. 29-

2 at 27). Plaintiff contacted the school to see what the charge was, whereupon she

was told that it was for student health insurance for the period she had remained out

on leave from August 2015 to January 2016. (*Id*.) This prompted Plaintiff to file a

second EEOC charge on June 14, 2016. (*Id*.) There, Plaintiff claimed that UAB

had instituted the insurance charge in retaliation for her having filed the first EEOC

---

[4] Plaintiff also alleged in her EEOC charge that she had an unspecified disability and that UAB's actions also constituted discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq. However, Plaintiff has not raised an ADA claim in this court.

charge.  (*Id*.)  She further asserted that, prior to filing that first charge, she was never told that UAB would not pay for her health insurance for the period in question or that she was responsible for it.  (*Id*.)

With respect to this claim, it is undisputed that UAB graduate programs required all students to have health insurance as a condition of enrollment.  (Doc. 29-10, Declaration of Carol Griggs ("Griggs Decl.") ¶¶ 8, 9; Doc. 29-17 at 3-4; Pl. Dep. at 77).  Such could be obtained either through UAB's student health insurance carrier ("VIVA Health") or through another insurance provider outside of UAB.  (Griggs Decl. ¶¶ 10, 11; *see also* Pl. Dep. at 78).  If a student desired to go the latter route, she had to complete and submit an insurance waiver to the UAB Student Health Services Department ("Student Health Services").  (Griggs Decl. ¶ 12; Doc. 29-17 at 3-4).  If a student failed to submit such a waiver, it would result in Student Health Services automatically placing coverage for the student with VIVA Health and notifying UAB's Student Accounting Department ("Student Accounting") to bill the student's account for the premium.  (Griggs Decl. ¶¶ 13, 17; Doc. 29-17 at 3-4).  Such billing occurs in the summer before the beginning of the fall term.  (Griggs Decl. ¶ 19).

On March 31, 2015, Plaintiff registered for classes for the fall term of the 2015-16 academic year, to begin that August.  (Ballinger Decl. ¶ 31).  As such, and because she had not filed an insurance waiver, Student Health Services

automatically enrolled Plaintiff for coverage under the plan with VIVA Health and billed her student account $840.00 for the premium on July 14, 2015. (Griggs Decl. ¶¶ 11-13, 20-21; Doc. 29-12). In Plaintiff's first two academic years, 2013-14 and 2014-15, such student health insurance premiums were paid by the BN program as part of her tuition scholarship. (Doc. 29-2 at 10, 13; Doc. 29-12; Doc. 29-7, Deposition of Terri Roberson ("Roberson Dep." at 81). However, because Plaintiff formally remained out on academic leave for the fall term and did not return thereafter, she never received a tuition scholarship for the 2015-16 academic year. Accordingly, the premium billed to her account for that fall term was not so paid. (*See* Doc. 29-12; Roberson Dep. at 81).

When the charge for the premium was billed to Plaintiff's student account on July 14, 2015, Plaintiff was on maternity leave, withdrawn from classes, and she would remain unenrolled on an academic leave of absence during the entire fall term. However, under UAB policy, those circumstances did not themselves terminate either Plaintiff's student status or her UAB student health insurance with VIVA Health, notwithstanding any suggestion to the contrary that Roberson had communicated to Plaintiff. (Griggs Decl. ¶¶ 14, 16; Ballinger Decl. ¶¶ 18-20; Doc. 29-2 at 96-97; Doc. 29-12; Roberson Dep. at 54). Plaintiff also indicated in emails to Dr. Sorge, Quinn, and Roberson at the end of August 2015 that she would enroll on her husband's health insurance, which Plaintiff did, in fact, proceed to do.

(Doc. 29-2 at 76; Doc. 29-6 at 37-38; Pl. Dep. at 76-79). However, Plaintiff never submitted an insurance waiver to Student Health Services. (Griggs Decl. ¶¶ 12, 13, 20; Pl. Dep. at 79; Doc. 29-12). As a result, again as per UAB policy, she retained coverage under the VIVA Health student plan, and the billed charge for the premium remained on her student account. (Griggs Decl. ¶¶ 12, 13, 20; Pl. Dep. at 78-79; Doc. 29-12). Indeed, Plaintiff received multiple statements from VIVA Health disclosing that it had paid a host of charges she had incurred for healthcare services rendered between September and December 2015, all during the fall term she was out on leave. (Pl. Dep. at 78-79; Doc. 29-2 at 80-91).

On July 29, 2016, Plaintiff filed this civil action against the Board pursuant to 42 U.S.C. § 2000e-5(f). (Doc. 1). In her now-governing Amended Complaint, Plaintiff raises claims under Title VII, as amended by the PDA, set forth in two counts. (Doc. 8, Amended Complaint ("Amd. Compl.")). The first, captioned "Sex (Pregnancy) Discrimination," is based on allegations that she "informed her supervisor(s) of her pregnancy and was not allowed to continue classes, which resulted in her termination." (Amd. Compl. ¶¶ 16-17; *see also id.* ¶¶ 6-15). The second count, captioned "Retaliation," is based her claim that UAB charged her student account for health insurance because she had engaged in activity protected under Title VII, namely, the filing of her first EEOC charge. (*Id.* ¶¶ 18-22).

The Board has now moved for summary judgment. (Doc. 27). The Board has supported its motion with a brief (Doc. 28) and an evidentiary submission. (Doc. 29). Plaintiff has filed a brief in opposition to the motion (Doc. 32), which attaches her declaration as an exhibit. (Doc. 32-1). The Board then filed a reply (Doc. 33), rendering the motion for summary judgment ripe for decision.

## III. DISCUSSION

### A. Sex Discrimination under Title VII and the Pregnancy Discrimination Act

Plaintiff's first claim seeks to hold the Board liable under Title VII and the PDA for unlawful sex discrimination related to her pregnancy. In relevant part, the anti-discrimination provision of Title VII makes it an unlawful for "an employer … to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). The PDA amended Title VII to clarify that discrimination "because of sex" includes discrimination because of "pregnancy, childbirth, or related medical condition" and mandates that women affected by such circumstances "shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k); *see also AT & T Corp. v. Hulteen*, 556 U.S. 701, 705 (2009); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669,

684 (1983); *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000);

*Byrd v. Lakeshore Hosp.*, 30 F.3d 1380, 1382-84 (11th Cir. 1994).  Thus, the focus

of a PDA claim is whether "an employer's policy treats pregnant workers less

favorably than it treats nonpregnant workers similar in their ability or inability to

work."  *Young v. United Parcel Service, Inc.*, ___ U.S. ___, ___, 135 S. Ct. 1338,

1344 (2015).

     Plaintiff would prove her PDA claim using circumstantial, rather than direct,

evidence of discriminatory intent.  Her claim is therefore generally subject to

analysis using the burden-shifting framework developed by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.  *See*

*Young* 135 S. Ct. at 1353-54.  Under that framework, the "plaintiff must carry the

initial burden' of 'establishing a prima facie case' of discrimination.  *Id.*, 135 S. Ct.

at 1345.  In expounding on that burden, the Supreme Court has explained:

> [A]n individual plaintiff may establish a prima facie case by
> 'showing actions taken by the employer from which one can infer, if
> such actions remain unexplained, that it is more likely than not that
> such actions were based on a discriminatory criterion illegal under'
> Title VII.  [*Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576
> (1978)].  The burden of making this showing is "not onerous." [*Texas
> Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)].
> In particular, making this showing is not as burdensome as
> succeeding on "an ultimate finding of fact as to" a discriminatory
> employment action.  *Furnco*, *supra*, at 576.  Neither does it require
> the plaintiff to show that those whom the employer favored and those
> whom the employer disfavored were similar in all but the protected
> ways.  *See McDonnell Douglas*, 411 U.S., at 802 (burden met where
> plaintiff showed that employer hired other "qualified" individuals

outside the protected class); *Furnco, supra*, at 575-577 (same); *Burdine, supra*, at 253 (same). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (similar).

*Young*, 135 S. Ct. at 1353-54. If the plaintiff is able to make out a prima facie case, the analysis proceeds to the second step, at which the burden shifts to the employer to produce evidence that the challenged adverse action was taken for one or more legitimate, non-discriminatory reasons. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993). Once the defendant does so, the plaintiff must, at the third and final stage, be afforded an "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (*quoting Burdine*, 450 U.S. at 253).

A plaintiff claiming pregnancy discrimination may establish a *McDonnell Douglas* prima facie case by presenting evidence sufficient to show the existence of the following: (1) she was pregnant; (2) she was qualified to do her job, (3) the employer subjected her to an adverse employment action, and (4) the employer treated a non-pregnant, similarly-situated individual more favorably. *See Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012); *see also Lawson v. City of Pleasant*

*Grove*, 2016 WL 2338560, at *7, 10 (N.D. Ala. Feb. 16, 2016) (Ott, M.J.).  While

this formulation contemplates the use of evidence of a "comparator" from outside

the protected class treated better, a plaintiff may establish a prima facie case

without such proof provided "she can show enough non-comparison circumstantial

evidence to raise a reasonable inference of intentional discrimination."  *Hamilton*

*v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012); *see also*

*Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255-56 (11th Cir. 2012);

*Byrd*, 30 F.3d at 1383.

Indeed, the Eleventh Circuit has made clear that "the *McDonnell Douglas*

framework … is not the *sine qua non* for a plaintiff to survive summary judgment

in a discrimination case."  *Sims v. MVM, Inc.*,704 F.3d 1327, 1333 (11th Cir. 2013)

(*citing Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).

Instead,

> "the plaintiff will always survive summary judgment if he presents
> circumstantial evidence that creates a triable issue concerning the
> employer's discriminatory intent." [*Smith*, 644 F.3d at 1328].  A
> triable issue of fact exists "if the record, viewed in a light most
> favorable to the plaintiff, presents a convincing mosaic of
> circumstantial evidence that would allow a jury to infer intentional
> discrimination by the decisionmaker."  *Id.* (footnote omitted) (internal
> quotation marks omitted).

*Sims, supra*.

The Board argues that it is entitled to summary judgment on this claim on

the basis that Plaintiff cannot establish that she suffered what is colloquially known

as an "adverse employment action." Such may arise from a discharge, failure to hire, suspension, demotion, or some other negative treatment that diminishes an employee's compensation or otherwise materially alters the terms, conditions, or privileges of employment. *See Crawford v. Carroll*, 529 F.3d 961,970-71 (11th Cir. 2008). Proof of an adverse employment action is essential element not only of a *McDonnell Douglas* prima facie case but also of a Title VII discrimination claim itself. *Holland*, 677 F.3d at 1056.

At the outset, the court recognizes that the Board has asserted that Plaintiff was a graduate student and not an "employee" of UAB at all, making her ineligible for relief under Title VII. *See generally Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1234-35 (11th Cir. 2004); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1242-43 (11th Cir. 1998). Plaintiff, on the other hand, insists that, by virtue of her appointment as Graduate Trainee, for which she was paid a stipend of almost $24,000 per year, conditioned upon her performing work in Dr. Sorge's lab, she was an employee. The court, however, need not resolve that broader issue. Because it does not affect the result reached, the court will simply assume for purposes of the Board's motion that, as a Graduate Trainee, Plaintiff could qualify as an employee, with respect to at least some actions that UAB might take against

her. [5] *See generally Cuddeback*, 381 F.3d at 1235 ("Courts that have considered whether graduate students constitute employees for the purposes of Title VII have distinguished between their roles as employees and as students, and have typically refused to treat them as 'employees' for Title VII purposes only where their academic requirements were truly central to the relationship with the institution.").

Plaintiff contends that she suffered an adverse employment action on the theory that UAB "terminated" her from her Graduate Trainee position, for which she was paid her stipend. (Doc. 8 at 4). "Discharge" from employment is obviously an adverse action. *See* 42 U.S.C. § 2000e-2(a)(1); *Llampallas*, 163 F.3d at 1246 n. 18. The only reasonable interpretation of the record, however, is that UAB never "terminated" or "discharged" Plaintiff from any position. Rather, the evidence establishes as a matter of law that the separation of Plaintiff from her position at UAB, both as student and as a Graduate Trainee, resulted from Plaintiff's own voluntary decision to resign or otherwise quit, as explained below.

In Plaintiff's view, her "employment" was "terminated" on the afternoon of August 28, 2015, immediately upon her being withdrawn from classes for the 2015-16 fall term, at Dr. Sorge's direction. (Doc. 8 at 4). UAB argues that such

---

[5] While Plaintiff did not to return to classes or lab work in the BN program, in late June 2016 she did apply for a non-student position with UAB as a "Researcher II" in the Department of Optometry Vision Science. (*See* Doc. 29-2 at 46-53). She was awarded that position on August 29, 2016, and she started the job on September 1, 2016. (*Id.* at 54-55). It is not disputed that Plaintiff became an employee of UAB at that time. However, Plaintiff's claims in this action are unrelated to that employment relationship.

was an "academic" action, not an "employment" action. It is not disputed, however, that that the withdrawal of Plaintiff from classes also necessary precluded her from working in the lab and being paid her stipend in the fall term. Specifically, Plaintiff's stipend appointment letter required that she both take nine semester hours of course work and perform a "service assignment" of no more than 20 hours per week, and it was through her work in Dr. Sorge's lab that Plaintiff would meet both conditions. That is, of Plaintiff's nine semester hours for the term, eight would come from a "course" for which she would receive one semester hour of credit for every 30 hours of lab work, while her "service assignment" was likewise comprised of her lab work.

But even assuming that a decision to withdrawal a graduate student from classes could under some circumstances functionally operate as a "termination" of "employment," the record does not support an inference that such is what occurred here. In this context, "terminate" is synonymous with "fire," "discharge" and "dismiss," all being common terms meaning the act, initiated by the *employer*, of *severing* the legal relation of employment with an employee. *See Peppers v. Fulton Cty. Bd. of Educ.*, 2018 WL 1283675, *2 (N.D. Ga. Jan. 18, 2018) (recognizing that "termination," "discharge," and "dismissal" are "common terms to express the employer-initiated end of an employment relationship"); *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 286 (1946) ("Discharge normally

means termination of the employment relationship or loss of a position"); *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1223 n. 12 (11th Cir. 2001) ("When an employee is terminated, the employment relationship ends." (*quoting Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 614 (10th Cir. 1988)); *Minch v. City of Chicago*, 486 F.3d 294, 303 (7th Cir. 2007) ("[A] discharge … severs the employment relationship between employer and employee"; "Being fired [involves] … the employer unilaterally terminat[ing] the employment relationship."); *Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 504 (6th Cir. 2017) (defining "termination of employment" as "the complete severance of an employer-employee relationship" (quoting Black's Law Dictionary (10th ed. 2014)). As such, the separation in a "termination" or "discharge" is complete, having an aspect of permanence, as distinguished from a temporary suspension, furlough, or layoff with an expectation of recall. *See Fishgold*, 328 U.S. at 286-87; *Howe v. Baker*, 796 F.2d 1355, 1360 (11th Cir. 1986). Each of the latter group is also employer-initiated but contemplates a continuing relationship with the employer. *See Fishgold*; *Baker*, 796 F.2d at 1360.

Whether the employer has actually terminated an employee is determined by an examination of the employer's statements and conduct, in context, to assess whether a reasonable person in the employee's position would have understood that the employer intended to dispense with her services. *See Thomas v. Dillard*

*Dep't Stores, Inc.*, 116 F.3d 1432, 1434-35 (11th Cir. 1997); *NLRB v. Ridgeway Trucking Co.*, 622 F.2d 1222, 1223 (5th Cir. 1980); *Payne v. Crane Co.*, 560 F.2d 198, 199 (5th Cir. 1977); *see also Andazola v. Logan's Roadhouse, Inc.*, 871 F. Supp. 2d  1186, 1208-09 (N.D. Ala. 2012).  The record could hardly be clearer that nothing communicated to Plaintiff by Dr. Sorge, Quinn, Roberson, or anyone else in the BN program was ever intended to completely or permanently sever the relationship between Plaintiff and UAB, whether as a student or a Graduate Trainee.  To the contrary, in all relevant communications throughout August 2015 and thereafter, Dr. Sorge, Quinn, and Roberson all patently allowed that Plaintiff could return to enroll in classes, work in the lab, and receive her scholarship and stipend appointment.  Indeed, they all gave Plaintiff every indication that they fully *expected* that she *would* so return.  The only question became whether she might do so midway through the fall term or at the start of the spring term in January 2016.  Consistent with that, in directing that Plaintiff be withdrawn from classes, Dr. Sorge clearly contemplated that such was to be merely "for [the fall] term." (Doc. 29-6 at 35; *see also id.* at 34 (advising Quinn that if Plaintiff failed to get in contact, they would "withdraw her from the program for Fall.")).  Likewise, when Plaintiff was first notified by Roberson of the withdrawal, Plaintiff was told that such was "for this semester" and that she might still "add the courses back to [her] schedule" by the following Monday.  (Doc. 29-2 at 74).  Then Dr. Sorge advised

Plaintiff that, although he had doubts about whether she could work enough hours in the lab to earn all course credit and satisfy her stipend assignment for the fall term, she could return full time in January 2016. (Doc. 29-2 at 76-77). Plaintiff herself indisputably understood this, as reflected both by her reply email to Dr. Sorge, stating that she interpreted him as saying it would be "more feasible [for her] to return full time in January" (*id.* at 77) and by her ensuing request for an academic leave of absence that would expire exactly then. (Doc. 29-2 at 92-94).

After that, Quinn sent Plaintiff an email in October 2015 advising that she needed to register for spring classes, review her schedule with Dr. Sorge, get her annual stipend letter signed, and be back in the lab full-time on January 11, 2016. Plaintiff, however, did none of those things. Instead, she immediately filed an EEOC charge and never again enrolled in classes, returned to work in the lab, or apparently communicated with Dr. Sorge, Quinn, or Roberson. Even then Plaintiff never received any kind of termination letter from UAB. Rather, on August 9, 2016, she sent an email to the BN program director, Dr. Amthor, stating that she no longer would be participating in the program and asking to terminate her student status. Certainly by that point, any employment relation that might have existed between Plaintiff and UAB through the BN program was finally ended. However, it was *Plaintiff* who had ended it, either by resigning via that email or by having

previously quit, through her failure to register for classes or return to work the lab in the spring term.

Generally speaking, an employee's decision to resign is presumed to be voluntary, *see Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995), in which case it does not give rise to an adverse employment action. *Williams v. Alabama DOC*, 649 F. App'x 925, 928-29 (11th Cir. 2016). It is true that, under some circumstances, a plaintiff's resignation may be treated as involuntary and thus "tantamount to an actual discharge." *Hicks v. City of Tuscaloosa, Ala.*, 870 F.3d 1253, 1258 (11th Cir. 2017) (*quoting Green v. Brennan*, 578 U.S. ___, ___, 136 S. Ct. 1769, 1776-77 (2016)). However, such a "constructive discharge" claim requires the plaintiff to establish that the employer has "discriminate[d] against [her] to the point such that [her] working conditions bec[a]me so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Id.*, 870 F.3d at 1258 (*quoting Green*, 136 S. Ct. at 1776). Plaintiff has neither pled a claim alleging she was constructively discharge nor presented sufficient evidence to support one. As such, Plaintiff did not suffer an adverse employment action by virtue of the circumstances by which her relationship with the BN program finally ended, whether as a student or an employee.

Even so, that conclusion does not necessarily foreclose that Plaintiff suffered an adverse employment action for purposes of this claim. Plaintiff says that "she is

making one claim of pregnancy discrimination about one action – she was not allowed to enroll in the fall semester of classes which prevented her from continuing in her job in the lab and her employment with UAB." (Doc. 32 at 22). Under that theory, Plaintiff might argue that, even if UAB did not "terminate" her, she still asked but was not allowed, she says, to return from leave until the start of the spring term in January 2016, instead of during the fall term. That would have prevented Plaintiff from working in the lab and being paid her stipend for several additional months. "[F]orcing an employee to take leave without pay may constitute an adverse employment action because it directly affects the employee's compensation." *Miller v. Brennan*, 2016 WL 1237851, at *2 (N.D. Ga. Mar. 30, 2016) (collecting cases)); *see also*, *e.g.*, *Clanton v. Orleans Parish Sch. Bd.*, 649 F.2d 1084 (5th Cir. Unit A July 1981) (holding that reinstatement provisions of school board's policy requiring pregnant employees to remain out on unpaid maternity leave for a specified period absent a waiver allowing reinstatement at the discretion of the superintendent violated Title VII); *Harper v. Thiokol Chem. Corp.*, 619 F.2d 489 (5th Cir. 1980) (employer's policy of requiring women on pregnancy leave to have sustained a normal menstrual cycle before they could return to work constituted unlawful sex discrimination under Title VII). Thus, assuming, as the court does, that Plaintiff's status as a Graduate Trainee gave rise to an employment relationship, a mandated further delay in Plaintiff's

reinstatement from unpaid leave once she was willing and able to work in the 2015-16 fall term could be an adverse employment action.

That might be so, however, only if UAB actually *required* Plaintiff to take unpaid leave for the fall term. "An employee's deliberate choice to alter his employment status does not constitute an adverse employment action." *Mattingly v. University of S. Fla. Bd. of Trustees*, 931 F. Supp. 2d 1176, 1188 (M.D. Fla. 2013). Thus, if Plaintiff had a choice to return to work in the fall or to take additional leave, her having voluntarily requested and being granted time off would not give rise to an adverse employment action. *See Lara v. Raytheon Tech. Serv. Co., LLC*, 476 F. App'x 218, 222 (11th Cir. 2012); *Campbell v. Hawaii Dept. of Educ.*, 892 F.2d 1005, 1014 (9th Cir. 2018).

UAB highlights that Plaintiff herself requested a leave of absence for the entirety of the fall term, with a clear understanding that doing so would also preclude her from working in the lab as to be paid her stipend. UAB thus intimates that that Plaintiff's decision to take that leave was voluntary, so she cannot be heard to complain about it. The court agrees. Plaintiff does not claim that Dr. Sorge or anyone else at UAB actually told her that that she could not enroll, that she was forbidden to work, or that she had to go on leave for the fall term. Rather, Plaintiff says merely that she believed she was being required to go on leave because of what she characterizes as Dr. Sorge's "extremely negative response" to

her proposed plan to remain on leave for several more weeks, with a part-time return in mid-September 2015 and then return full-time in October. (Doc. 32 at 13, ¶ 52; *see* Pl. Dep. at 74-76). However, the record shows that Dr. Sorge expressed to Plaintiff that he was "*not sure* what the best *option* [*was*]" for Plaintiff's return to work in the lab. (Doc. 29-2 at 77 (italics added)). Plaintiff emphasizes, though, that Dr. Sorge also stated that, if she were to come back partway through the fall term as she was proposing, he estimated she would have to work almost ten hours per day in the lab between October 1st and December 11th in order to earn all course credits and satisfy the service-assignment condition of her stipend appointment for the term. (Id.) He also doubted aloud whether that was an "attainable goal for most people." (Id.) In response, however, Plaintiff made no suggestion that estimation of the number of hours she would need to work was erroneous or that she could work them. Instead, she demurred, recognizing that what Dr. Sorge had said was "definitely understandable" and asking whether he was saying that it would be "more feasible [for Plaintiff] to return full time in January." To that Dr. Sorge replied, "I *think* that is *likely* the best *option* for all, *assuming* we can avoid any gaps in insurance for you and [your baby]." (*Id.* (emphasis added)). Plaintiff then proceeded to request a leave of absence for the entire fall term. Whatever Plaintiff's subjective interpretation of Dr. Sorge's statements, the court concludes that they do not support an inference that an

objectively reasonable employee in Plaintiff's position could have believed that Dr. Sorge was *mandating* that she take additional unpaid leave for the entire fall term. Rather, a reasonable employee would have understood that he was ultimately still giving her the "option" of enrolling in classes and coming back to the lab in the fall term, immediately or otherwise, just so long as she were to work enough hours to meet her course work and stipend appointment "service" requirements. In fact, Dr. Sorge testified that, had Plaintiff insisted she could do so, he would have allowed her to enroll in classes and return to work in the lab in the fall term. (Sorge Dep. at 77). Because the evidence shows as a matter of law that Plaintiff's decision to take leave for the fall term was voluntary, it did not amount to an adverse employment action, entitling the Board to summary judgment.

Even if it were assumed, however, that Dr. Sorge effectively forced Plaintiff to delay her re-enrollment and concomitant return to the lab until the start of the spring term in January 2016, the court would still agree with the Board that the evidence is insufficient to support that such action was motivated by Plaintiff's pregnancy. At the outset, Plaintiff conspicuously admits that "she cannot provide evidence of a similarly[-]situated male or non-pregnant comparator" (Doc. 32 at 28) that UAB treated more favorably relative to the adverse action she challenges. Thus, Plaintiff does not attempt to prove a classic prima facie case under *McDonnell Douglas*. Instead, she attempts to raise an inference of UAB's

unlawful discriminatory intent based solely on an ostensibly "convincing mosaic" of other circumstantial evidence. (Doc. 32 at 28-30). The Eleventh Circuit has stated, albeit in an unpublished and thus non-binding opinion, that a "convincing mosaic" may be shown by evidence such as

> (1) suspicious timing, ambiguous statements, similar behavior directed at other members of the protected group, and 'other bits and pieces from which an inference of discriminatory intent might be drawn'; (2) systematically better treatment of those outside the protected class; and (3) pretext in the employer's justification.

*Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 976 (11th Cir. 2014) (*citing Silverman v. Board of Educ.*, 637 F.3d 729, 733-34 (7th Cir. 2011)); *see also Lewis v. City of Union City, Ga.*, 877 F.3d 1000, 1018 (11th Cir. 2017), *opinion vacated, reh'g en banc granted*, 893 F.3d 1352 (11th Cir. 2018); *Moore v. Pool Corp.*, 304 F. Supp. 3d 1148, 1162 (N.D. Ala. 2018); *Hale v. University of Ala. Bd. of Trustees*, 2018 WL 4215595, at *9 (N.D. Ala. Sept. 5, 2018).

The leading piece of Plaintiff's would-be mosaic is a conversation she says she overheard between Dr. Sorge and S.T.[6], another female graduate student who entered the BN program at the same time as Plaintiff. According to Plaintiff, while working in the lab, she heard Dr. Sorge and S.T. suggest that "people like them should be able to decide who gets to have kids and who doesn't." (Pl. Dep. at 90).

---

[6] Because academic information regarding students who are not parties to litigation is generally protected by the Federal Education Rights Privacy Act, 20 U.S.C. § 1232g; 34 C.F.R. Part 99, the Board refers to students other than Plaintiff by their initials and has asked the court to do the same in any written opinions or orders in the case. (Doc. 28 at 17 n. 4).

Plaintiff says that conversation took an ugly turn towards "eugenics" when S.T. said that "people with genetic defects shouldn't be allowed to have children," and Dr. Sorge similarly "mentioned that he felt mentally ill people should not be allowed to have kids." (*Id*.) Plaintiff took particular offense at these remarks not only because she was, by her estimation, over seven months pregnant at the time but also because she has bipolar disorder, a fact of which Dr. Sorge was then aware. Plaintiff maintains that Dr. Sorge's comments "are evidence of a discriminatory animus against pregnant women, especially those with a mental illness," and thus "contribute a great amount to the convincing mosaic." (Doc. 32 at 29).

Dr. Sorge adamantly denies making any such remarks. Of course, the court is bound at summary judgment to credit Plaintiff's testimony that he did. Nevertheless, whether this evidence can supply support for the proposition that Dr. Sorge, in having Plaintiff delay her reinstatement, was motivated by her pregnancy is debatable. Even if having some tendency to reflect a discriminatory bias, a "stray remark 'isolated and unrelated to the challenged employment decision'" may have limited probative value in this context. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002)); *see also Scott v. Suncoast Bev. Sales, Ltd.*, 295 F.3d 1223, 1228-29 (11th Cir. 2002); *Ash v. Tyson Foods, Inc.*, 190 F. App'x 924,

926 (11th Cir. 2006). Dr. Sorge's remark is isolated, being the only instance in which he supposedly uttered anything reflecting a bias potentially related to having children or pregnancy. It is also is relatively remote in time from the challenged employment decision. Given Plaintiff's testimony that she overheard Dr. Sorge and S.T.'s conversation while Plaintiff was working in the lab, it would have occurred before June 4, 2015, when she is documented to have stopped working before commencing maternity leave. As such, the statement would have necessarily been made, at a minimum, more than two-and-a-half months before August 28, 2015, when Plaintiff was withdrawn from classes and Plaintiff claims Dr. Sorge's emails convinced her she had to take leave for the fall term.

Most importantly, however, the substance of Dr. Sorge's remark arguably is removed from the challenged employment action. To be sure, Dr. Sorge's comment, if made, would indicate he harbors some abhorrent views about the right of people with mental illness to procreate. On its face, however, the remark expresses disapproval of people with *mental illness having children*, not an animus against *pregnancy*. To the contrary, the comment would have equal application to anyone with mental illness, whether male or female, who would perpetuate their genetic material through offspring. Pregnancy enters into the equation only insofar as biology determines that it is women who would carry and bear such children. It is therefore questionable whether Dr. Sorge's remark may be viewed as reflecting a

bias based on pregnancy or gender at all.[7]  But even assuming it could have some

tendency to do so, Title VII, as amended by the PDA, does not prohibit

discrimination based on pregnancy *per se*; it prohibits employers from treating

pregnant employees worse than non-pregnant employees who are similarly

restricted in their ability or inability to work.[8]  Dr. Sorge's remark has no

connection to the ability or inability of any employee to work, to the taking of

leave, reinstatement therefrom, or to any other aspect of employment.  As such,

contrary to Plaintiff's assertion, Dr. Sorge's remark has limited value in

establishing that he sought to delay Plaintiff's return from unpaid leave for several

months because of her pregnancy.

    For the next piece of circumstantial evidence that would support her

discrimination claim, Plaintiff points to her own testimony that Dr. Sorge, and to

some extent Quinn, treated S.T. more favorably, generally speaking, after Plaintiff

---

[7] While Dr. Sorge's alleged remark would reflect an animus against those with mental illness, Plaintiff has not pled any claim for discrimination because of her bipolar disorder or any other potential disability.

[8] Under the Family and Medical Leave Act of 1993 ("FMLA"), an employer is generally required to allow an employee to take up to twelve workweeks of unpaid leave per year for the birth of a child or a serious health condition and to then restore such employee to her same position or an equivalent one.  29 U.S.C. §§ 2612(a)(1), 2614(a)(1); *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241 (11th Cir. 2010).  Plaintiff, however, has asserted no FMLA claim in this action, and she did not seek to be reinstated until after she would have taken over twelve weeks of leave, eight of them paid.

became pregnant.[9] Plaintiff first cites alleged disparate treatment at an out-of-town

professional conference that Plaintiff, S.T., and Dr. Sorge attended in mid-May

2015. Specifically, Plaintiff says that Dr. Sorge spent most of his time at the

conference with S.T.; he recommended to S.T. which events she might attend by

circling them on her itinerary while not doing likewise for Plaintiff; he introduced

S.T. to people in the field that he did not introduce to Plaintiff; and he showed

S.T.'s project poster display to conference attendees while not doing likewise with

Plaintiff's poster. (Pl. Dep. at 51-53). Plaintiff further complains that Dr. Sorge

favored S.T. when they were both doing work in connection with writing grant

proposals in February and March 2015. In this vein, Plaintiff alleges S.T.'s project

was added to a protocol before hers was; Dr. Sorge obtained supplies for S.T. to

conduct experiments to obtain preliminary data while Dr. Sorge and Quinn failed

to fill Plaintiff's supply requests; and that Dr. Sorge helped S.T. edit her grant

proposal writing while ignoring Plaintiff's requests. (Id. at 53-57). Plaintiff also

relates that, in 2015, Quinn gave S.T. more learning opportunities in the lab by

allowing her to practice surgeries on rats, while not letting Plaintiff to do so,

---

[9] The court notes that, the record reflects that S.T. herself became pregnant sometime in the spring of 2015 and took maternity leave from the lab starting in January 2016, although it is unclear when Dr. Sorge became aware of S.T.'s pregnancy. However, any differences in treatment between S.T. and Plaintiff in relation to the time S.T. was known to be pregnant cannot support an inference that sex or pregnancy was a motivating factor in any relevant decision insofar as S.T. would have then been in Plaintiff's same protected class. *See Lawson*, 2016 WL 2338560, at *10.

because, Quinn said, she was worried it would negatively impact Plaintiff's pregnancy. (*Id*. at 58-59).

None of this comparative evidence is compelling. To start with, Quinn was not a decisionmaker with respect to whether Plaintiff would remain on unpaid leave for the fall term. Thus, what Quinn might have said or done is not worth much, if anything, in proving that the challenged decision, attributed to Dr. Sorge, was motivated by unlawful discriminatory intent. *Cf. Steger v. General Electric Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (recognizing that statements of nondecisionmakers are insufficient to prove pretext). As to Dr. Sorge himself, he has offered testimony explaining away at least much of the differences in treatment Plaintiff describes. For instance, the Board has pointed out, and Plaintiff has not challenged, that Plaintiff was ill during the conference; that on the trip she turned down invitations to join Dr. Sorge and S.T. on a number of occasions, citing her preference to stay with her husband, who had accompanied her; and that S.T. had asked Dr. Sorge to point out events to attend and to meet certain people at the conference whereas Plaintiff did not. (*See* Sorge Dep. at 65-67; Pl. Dep. at 52-53). Dr. Sorge also explained, and again Plaintiff has not disputed, that Plaintiff's experiments for the grant proposal were added to a research protocol after S.T.'s because S.T.'s project could be added to an existing protocol whereas Plaintiff's required a new one which took longer to get approved. (Sorge Dep. at 69). But

the larger point is this: even assuming Dr. Sorge generally favored S.T. in the ways Plaintiff says, that would hardly suggest "*systematically* better treatment to those outside" Plaintiff's protected class. *Smith*, 588 F. App'x at 976 (emphasis added). S.T. is one person; if Dr. Sorge liked or treated her better than Plaintiff, it could be for any number of reasons, personal or professional, fair or unfair, having nothing whatever to do with Plaintiff's pregnancy. Indeed, Plaintiff acknowledges that she *repeatedly* asked Quinn over time why she thought Dr. Sorge treated S.T. better, suggesting that Plaintiff had long-standing feelings that he had simply *always* preferred S.T. for reasons that Plaintiff found elusive. (Pl. Dep. at 60). Finally, the nature of Dr. Sorge's alleged disparate treatment of Plaintiff and S.T. is, again, removed from the adverse action Plaintiff challenges: the delay of her reinstatement from leave to working in the lab. Again, none of the instances Plaintiff cites has to do with leave or the ability to work, nor does Plaintiff claim that any of them, individually or collectively, materially altered her working conditions so as to give rise to an adverse employment action. Plaintiff's testimony at issue thus provides at best only weak circumstantial evidence that Dr. Sorge discriminated against Plaintiff because of her pregnancy.

The last pieces of Plaintiff's evidentiary mosaic are made up of circumstances that Plaintiff claims cast suspicion and doubt both on Dr. Sorge's direction on August 28, 2015, to have Plaintiff withdrawn from fall classes and on

his stated reasons for then telling Plaintiff that he believed the "best option" was for her remain on leave through January 2016. *See generally Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). First, Plaintiff emphasizes that it was only a few minutes after one o'clock in the afternoon on Friday, August 28, 2015, when Dr. Sorge directed Roberson to have Plaintiff withdrawn from fall classes. Plaintiff argues that action was irregular and was inconsistent with what Plaintiff had been told in Roberson's email of August 25th. That email, according to Plaintiff, gave her until August 28th to give the school on her decision on whether she would choose (1) to take leave for the fall term and return full time in January or (2) to register for fall classes with a part-time return to the lab in mid-September and full-time in October, as set forth in Quinn's prior email to Plaintiff dated August 18th. "Like all other days," Plaintiff posits, "August 28th was comprised of 24 hours and did not end at 1:05 p.m., [when] Sorge directed Roberson to withdraw [Plaintiff] from class" … nor "at 1:57 p.m., [when] Roberson sent her email to [the registrar] requesting withdrawal." (Doc. 32 at 26). Plaintiff thus suggests Sorge acted prematurely and in bad faith because he directed Plaintiff's withdrawal *on the day of* August 28th, not after it. The court disagrees, however, that such is a reasonable inference from the evidence.

First of all, as explained previously, the decision to withdraw Plaintiff from classes does not carry the significance Plaintiff would ascribe to it. That withdrawal was only for the fall term, and Plaintiff was immediately told that she could still potentially add the classes back to her schedule by the following Monday. Second, while Quinn's email of August 18th laid out two potential "scenarios" for Plaintiff's return from leave, as set forth above, Plaintiff was not advised in that email or in Roberson's on August 25th that Plaintiff could just unilaterally "pick" one of the two options in Quinn's email and then simply "tell" the school which one she wanted on August 28th. Rather, Quinn's email explained to Plaintiff that while she might possibly return sometime mid-term in the fall, that option raised a question related to "the number of lab hours [Plaintiff] would have to complete in order to qualify for [her] credits." (Doc. 29-2 at 75). Plaintiff was also expressly instructed that she was expected to "[t]alk to [Dr. Sorge] about it so that [both of them could] decide the best course of action." (*Id*.) Roberson's follow-up missive on August 25th is a bit more ambiguous, stating Plaintiff "must decide on which option" in Quinn's email would "work best for" her and that they "need to move forward on a resolution by Friday[, the 28th]." (*Id*. at 74). It too, however, stressed the need for immediate communication from Plaintiff, concluding, "Be in touch as soon as you can." (*Id*.) Ultimately, however, it does not really matter what Plaintiff believed she had to do; it is what *Dr. Sorge* thought

and expected Plaintiff had to do. *See Alvarez*, 610 F.3d at 1266 ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."). And all of Dr. Sorge's testimony and his documented communications, whether with Plaintiff, Quinn, or Roberson, establish that he consistently was concerned about Plaintiff's ability to work enough hours during the fall semester and that he expected Plaintiff to discuss that matter with him before any decision entailing her return during the fall term was finalized. That evidence likewise shows that Dr. Sorge was very concerned that Plaintiff had not done so. Thus, his directive to withdraw Plaintiff from classes does not support that he discriminated based on Plaintiff's pregnancy.

Finally, Plaintiff similarly contends that Dr. Sorge's stated grounds for suggesting to Plaintiff that she should remain on leave for the fall term were based on "information that was not true." (Doc. 32 at 30). In particular, Plaintiff says that she was not actually required to take nine credit hours during the semester, as demonstrated by the fact that, in January 2015, Plaintiff had medically withdrawn from one course but remained enrolled in courses for six credit hours. Second, Plaintiff asserts that her stipend appointment letter did not require her to work 20 hours per week; rather, she says, it specified that she work "no more than" 20 hours per week. Again, both of these arguments fall short of the mark. Plaintiff

has not shown that she qualified for, or asked for, a medical withdrawal for the 2015-16 fall term.  Rather, Plaintiff was seeking to take more leave and return part way through the fall term simply because she wanted to, not because she claims to have had a qualifying medical condition.  In any case, the information that Dr. Sorge shared with Plaintiff in his email was based on the fact that Plaintiff had registered for an eight semester-hour course comprised of work in his lab, and it is in no way unreasonable or striking that he would demand that Plaintiff commit to working the number of hours required to earn those course credits for the term. Plaintiff's latter point that her stipend appointment required her to work "no more than" twenty hours per week is just quibbling.  In the end, Plaintiff offers nothing to show that Dr. Sorge's interpretation stated in his email in relation to the hours Plaintiff was expected to work in his lab each week to earn her course credits and meet her stipend service assignment was, in fact, wrong at all.  But even if he could have been, Plaintiff still must present evidence that Dr. Sorge did not *honestly*, even if perhaps *mistakenly*, believe his understanding was correct.  *See Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J., concurring specially) ("[E]stablishing pretext is not merely demonstrating that the employer made a mistake [in its assessment of an employee's job performance or conduct], but that the employer did not given an honest account of its behavior."). Because Plaintiff has failed to present a convincing mosaic tending to show that

UAB discriminated against her because of her pregnancy, the Board is entitled to summary judgment on this claim.

## B. Title VII Retaliation

Plaintiff's other claim is that the Board is liable under Title VII for unlawful retaliation. Title VII's anti-retaliation provision is 42 U.S.C. § 2000e-3(a). In relevant part, it makes it unlawful for "an employer to discriminate against any of his employees … because [the employee] has … made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." The crux of Plaintiff's claim is that UAB charged her student account $840.00 for a health insurance premium, allegedly in retaliation for her having filed the first EEOC charge in October 2015.

Plaintiff's retaliation claim also relies on circumstantial evidence. As such, it is generally subject to analysis at summary judgment using the *McDonnell Douglas* framework. *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). To establish a prima facie case of retaliation, Plaintiff would have the burden to show: (1) she engaged in activity protected under Title VII; (2) UAB subjected her to a materially adverse action; and (3) there is a causal link between the protected activity and the adverse action. *Id.*

While there is no dispute that Plaintiff's filing her EEOC charge was protected activity, the Board argues that billing Plaintiff's student account for the

insurance premium did not cause her to suffer a materially adverse action. But because it does not affect the result reached, the court will assume to the contrary and proceed to the Board's ensuing argument that Plaintiff cannot present sufficient evidence of a causal nexus between Plaintiff's EEOC charge and the billing on her student account. In particular, it is axiomatic that no causal connection can exist when an employee engages in protected activity *after* the challenged adverse action was taken. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000). Plaintiff filed her EEOC charge on October 29, 2015. And while Plaintiff says she did not receive *notice* from UAB that she owed for the health insurance premium until May 2016, the Board has presented evidence that the Plaintiff's student account was actually billed for the premium on July 14, 2015, pursuant to standard UAB policy, because Plaintiff was registered for fall classes and she had not submitted an insurance waiver to Student Health Services. Plaintiff has not presented any evidence to genuinely dispute that. As such, she cannot prove that she was billed for the premium based on her later-filed EEOC charge.

But even if one assumes that Plaintiff's testimony could indicate that UAB instituted the billing charge on her account around the time Plaintiff received notice of it in May 2016, she still has not pointed to sufficient evidence of causation. Plaintiff has not referred the court to any evidence to support that the

filing of her EEOC charge motivated the billing for the premium on her student account other than an alleged temporal proximity between them.[10] But to establish causation in this context by such proximity alone the two events must be "very close," generally something less than three months. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (*quoting Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). The gap here, from the filing of the EEOC charge at the end of October 2015 and Plaintiff's receipt of a bill for the insurance premium in May 2016 is something on the order of six months. Under circuit precedent, that's simply too long to allow an inference of causation. The Board is entitled to summary judgment on Plaintiff's retaliation claim.

---

[10] The court notes that Plaintiff has argued in her brief that "UAB admitted that [billing her for the insurance premium] should have never happened and removed this charge from Plaintiff's account." (Doc. 32 at 31). However, Plaintiff provides no citation to the record for that statement. It is true that the BN program ultimately agreed to cover the premium charge voluntarily, so Plaintiff never had to pay it. But there is nothing in the record resembling an admission by UAB that the charge was improperly applied to Plaintiff's student account. Nor does Plaintiff even begin to explain specifically why she might think the charge was, in fact, legally illegitimate. Rather, the evidence is that charge was billed to Plaintiff's student account automatically on July 14, 2015, pursuant to standard UAB policy. To be sure, on August 28, 2015, Plaintiff advised Dr. Sorge, Quinn, and Roberson via email that she intended to get on her husband's health insurance when she went on leave for the fall term, which she did later do. Nevertheless, Plaintiff never submitted an insurance waiver to Student Health Services, as would have been required to terminate her existing student health insurance coverage. Thus, that coverage continued; indeed, the carrier paid multiple billed charges for health services Plaintiff received during the 2015-16 fall term while on leave. Finally, while Plaintiff's student health insurance premiums for her first two years were covered by her tuition scholarship, it is undisputed that she never received such a scholarship for the 2015-16 academic year, given that she never re-enrolled for classes or returned to the work after going on leave at the start of fall term.

## IV.   CONCLUSION

Based on the foregoing, the Board's motion for summary judgment (Doc. 27) is due to be **GRANTED**.  A separate final order will be entered.

**DATED** this 2nd day of November, 2018.

_____

**JOHN E. OTT**
Chief United States Magistrate Judge